Judge Green
delivered his opinion.
The Appellees having obtained Decrees against William Bentley, filed their Bill against him, and many persons holding personal, and others holding real property, some of them direetty, and others indirectly, under him, the object of which was to set aside the conveyances as being fraudulent as to them, and to subject the property, thereby conveyed, to the satisfaction of their claims.
.The Counsel for Colenian, who holds a part of the land in question, urged as an objection to the jurisdiction of the Court, that at the time when the Bill was filed, the Pláintifís had not a capacity to sue-Out 'Elegits on their Decrees, without taking some further preliminary step to enable them to do so, and consequently had not then a subsi’sting'lien on their debtor’s land, that not being the effect of a Judgment only per sc, but of the capacity to extend it by Elegit, and that a creditor at large, having no lien on his debtor’s land, cannot claim the aid of a Court of Equity, in order to enable him to reach it by removing impediments to his proceedings at Law. This objection, if Well founded, would lead to the dismission of the Bill as to the relief sought, in respect to all the lands mentioned in it.
The objection is founded on the decision of this Court in Eppes v. Randolph, 2 Call, 125, and a recent decision of C. J. Makshaxl, to the same effect,- in which it was held, that a judgment creditor could not overreach in Equity a bona fide conveyance of his debt- or’s land, made after the Judgment, and at a time when the capapacity to sue out an Elegit was suspended in consequence of no Execution having been sued out within ' the year-, and no election entered on the Record, or for any ether cause. These decisions proceeded upon the merits of the respective cases, and not upon the question of jurisdiction, and whether right or wrong, do not touch the case under consideration, either in respect to the question of jurisdiction, or upon its merits; for here all the Defendants were pur *629 chasers before the date of the Decrees, and are charged toiiave purchased fraudulently. And in all the cases upon the subject, in the English Court of Chancery, it seems to have been the uniform course to consider a Judgment, with a capacity to acquire the right to sue out an Vlegil; by /Shire Facias or otherwise, as such a lien as gave to the Court whenever other circumstances justified its interposition. And in no case has there ever been any enquiry whether the Judgment had been kept alive by taking out Execution within the year, or otherwise, or whether it had been actually revived or not, in the case of the death of either party, unless from some cause, (for instance the great lapse of time,) it was doubted whether the party could revive his capacity to sue out an TfAegit, by reviving his Judgment, as in the case of Burroughs v. Elton, 11 Ves. 29.
However all this may be, I think it clear that at the time when this Bill was filed, the Plaintiffs had an existing capacity to sue out E/qg-ifs upon their Decrees, without any preliminary proceeding •whatever. They had taken out Executions of Fieri Facias, which had been levied, and returned in part satisfied by the sale of the property taken, without any return of Nihil as to the residue. And in such a case, it is contended, that the Plaintiff could not take out an Flcgit, without first taking out a new Execution of Fi. Fa., and having it returned Nihil, upon the ground that upon the just construction of our Statute concerning Executions, it was required that a party electing to resort to one species of Execution, could not resort to one of another description, Until he had exhausted the effect of the first, by pursuing it to a return of Nihil or Non est Inventus; and, especially, that upon the literal terms of the Statute, an Flegit could not be taken out after a Fi. Fa. or Ca. Sa. returned, unless the return was Nihil, or Non est Inventus.
This leads us to a particular examination of our Statute, the first section of which provides, that aJI “persons who have, or shall hereafter recover any debt, damages or costs, in any Court of Record, may at their election prosecute Writs of Fieri Facias, Elegit, and Capias ad Satisfaciendum, within the year, for taking the goods, lands and body of the debtor.” It then prescribes the teste and return days, and the forms of those Executions, and of their returns, The third section provides, that “ when any Writ of Execution shall issue, and the party, at whose suit the same is issued, shall afterwards desire to take out another Writ of Execution at his own proper costs and charges, the Clerk may issue the same, if the first be not returned and executed; and where, upon a Ca. Sa. the Sheriff shall return, that the Defendant is not found, the Clerk *631 may issue a Vi. jFa,; and if, upon a Vi. Va. he shall return that the party hath no goods, or that only part of the debt is levied j in such case it shall be lawful to issue a Ca. Sa. upon the same Judgment; and where part of a debt shall be levied upon an Vtlegit, a new Elegit shall issue for the residue; and, -where Nihil shall be returned upon any Writ of V¡\egit, a Ca. Sa. or Vi. Vd- may issue, and set viceversa; and where one Judgment is obtained against several Defendants, Execution thereon shall issue, as if it were against one Defendant, and not otherwise. ”
The fourth section, enacts the' provisions of 32 Hen. 8, ch. 5, which provides, that if a tenant by Elegit be evicted, he may have Scire Vacias against the debtor, his heirs, executors and administrators, and have such Executions for the residue of his debt unpaid, as if no. Execution had theretofore issued,- enlarging- the provisions of the English Statute, in this, that whilst that only allowed a new Elegit, our's allows a new execution of any sort. The next three' sections enact the provisions of the 16th and 17th Car. 2, ch. 5, declaring, that an Extent shall not be avoided on account of the omission of any lands which were extendable. The eighth and ninth sections enacts the provisions of the 21st Jas. 1, ch. 24, authorising a new Execution against the’ lands and tenements, goods and chattels of a debtor dying in execution, except such lands’ and tenements as have been b'o na fide sold for the payment of some other creditor, and the proceeds so applied.
The thirteenth seetion enacts the provision of 29th Car. 2, ch. 3, declaring, that goods shall be bound by a Vi. Fa. only from the time of the' delivery to the Sheriff.
The twenty-eighth section provides, that á debtor in execution “may relieve' his body,- by surrendering goods to he Sold' as if taken under a Fa., provided that if they be not sufficient to pay the debt, orare subject to a lien, a new Fi. Vd. tit Ca. Sa. may issue'. These are all the provisions- which touch the question under consideration.
The' argument,- that a; party having, once made' an election to take one species of Execution, cannot afterwards' resort to another, till that elected- is- exhausted by a return of Nihil or not found, proceeds upon the idea, that such is the effect of the first section giving such election, or'the consequence of the particular provisions of the third section, according- to Which, in ¿Very case, (except one, in which a new species of Execution is allowed to be resorted to,) the former is- supposed to’ be first returned Nihil,- or not found; and- so in the twenty-eighth section,- in which a Vi. Fa. or a Ca. Sa.. but not an- Elegit, is allowed after a debtor has been discharged upon- *632 the surrender of property, which proves insufficient to pay the debt incumb.ered. And the other suggestion, that the literal terms of the Statute allowing a Ca. Sa. or Fi. Fa. after an Elegit returned Nihil, and so vice versa forbids an Elegit after a Ca. Sa. or Fi.^ Fa., unless they be returned Nihil in the one case, and not found in the other, proceeds upon the idea, that our Statutes have abrogated the Common Law in respect to Executions, and contain in their own provisions all the Laws in force upon that subject, none of which propositions appear to me to be sustainable. And if not, then upon Common Law principles connected with the Statutes giving the Elegit the latter Execution might issue after a Fi. Fa. in part satisfied, although not returned’ Nihil, as was decided in the case of Berry v. Wheeler, 14 Car. 2; 1st Siderfin, 91.
The Statute of Westm. 2, 13 Edw. 1, ch. 18, which gave the Elegit, is nearly in the language of ours: “When debt is recovered Or acknowledged in the King’s Court', or damages awarded, it shall be from henceforth in the election of him that sueth for such debt or damages, to have a Writ to the Sheriff Fiera Facial of the lands, (Levari Facias) 2 Inst. 395, and goods (Fi. Fa.) 2 Inst. Ibid., or that the Sheriff shall deliver to him all the chattels of the debtor, saving only his oxen and beasts of the plough, and the one-half of his land,” &c. At this time, the Writ of Ca. Sa. in the case of a private person, was only allowed in cases of trespass vi et arnriis, when the Capias in Process laid. It was afterwards extended to other cases, by allowing the Capias ad Respondendum to them.
The early constructions of the Statute of Westminister, proceeding or. the maxim that iielecllo wines est exclvslo cñterlus.” determined,, that when the creditor had elected one species of Execution, be could never resort to any other, although that elected proved ineffectual. Thus, in 20 Edw. 2, Execution, 132, it was held, that after a Ca. Sa. awarded, although it was returned “not found,” no other Execution could afterwards issue; and so in 19th H. 6th, it was held, that after an Elegit prayed and entered on the Record, the party could not resort to any orther Writ of Execution, because he had made his election; and in the early cases there are many instances of the like construction. But this rigorous, and to creditors, mischievous construction, gradually gave way to a more liberal spirit in the Courts of Justice, favoring the remedies of creditors, and in some instances, in which the contrary principle had become so fixed as to be beyond the power of the Courts, the Legislature interposed in their favor, as in the instances of the Statutes of Hen. 8, Jac. 1, and Ch. 2, incorporated into ours. And when our Statute *633 of 1726, the prototype of the present, so far as the question under con" sideration is concerned, was passed,this principle of construction was' almost wholly, and soon after was entirely repudiated, and the doctrine fully settled, that a creditor might take in-succession all sorts of Execution, as long as it appeared that his Judgment was not, and until it was fully satisfied, unless indeed some Execution had been levied, which had such a tendency to satisfy, as that there was no criterion by which to ascertain for what sum a new Execution , should issue; as a Ca. Sa. executed, or lands extended under an ' Ele git. ■ Our Statute of 1726, so far from intending to abolish the Common Law and English Statutes in force here in respect to Ex"ecutions, and to return to the strict doctrine of election, which had prevailed in ancient times, was, I think, designed to declare, that the Common Law and English Statutes, prior to the 4th of James 1, were still in force here, and to be continued; and to adopt, not only the liberal constructions of the Courts-in favor of creditors, as far as they had then gone, but the Statutes in the same spirit which had been passed since our Colonization. .Accordingly, it recites that by the Common Law of England, and divers Acts of Parliament, which are binding on the people of this Colony, all creditors might, at the\r election, within the year, prosecute Executions of Fi. Fa., Ca. Sa. and Eicgit; and professes only to prescribe the forms of those -Executions, and their returns, in order to produce uniformity in practice. And whilst it omits to enact the Statute of Westm. 2, which gave the Elegit, and that of 32 Hen. 8, giving remedy to ■ tenants by Ele git evicted, as being already in force, it enacts verbatim the other English Statutes, now incorporated in our Statute, which passed subsequent to the 4th James 1, which had no force here till so re-enactecl. And the preamble to the section which enacted those provisions, which are now in the third section of our present Act, declared that they were enacted for the purpose of “removing all scruples which may be entertained amongst Clerks concerning the issuing of Executions;” and in giving directions concerning the issuing of Executions, the Act conformed to the most liberal decisions which had then taken place in favor of creditors. Thus, the first provision that the Plaintiff might have two Executions of different' kinds in the hands of the Sheriff, provided he had .only one executed, was contrary to the ancient principle of election, but in conformity to the then very recent decision (in 1725) of Stamper v. Hodson, 8 Mod. 302. So, as to the second provision, allowing a Fi. Fa. after a Ca. Sa. returned “ Not found,” which was in conformity to the decision in Hob. 57. So as to the third, allowing u'Ca. Sa. after a Fi. Fa. returned “Nihil,” or in *635 part satisfied, which was according to Carr v. Copping, 4, James, cited 11 Vin. Abr. 38, pl. 5. So in the fourth case, of an Elegit allowed after an Elegit in part satisfied; that agreed with the decision in the case of Glasscock v. Morgan, 14 and 15 Car.; 1 Lev. 92. And so also in the fifth case, of a Ca. Sa. or Fi. Fa. after an Elegit returned “Nihil;” that was in conformity with the determination in Andrews v. Cope, 15 James 1; cited Hob. 57; 11 Vin. Abr. 42, Execution, (Y. a.) And so in the sixth case, of an Elegit after a Ca. Sa. returned “Not found,” or a Fi. Fa. returned “Nihil;” that agreed with the more ancient cases of 30 Edio. 3, 24 and others. And the last provision, directing Executions to issue against several, as if there were but one Defendant, pursued the decision in Rosser v. Welch & Kemmis, Godb. 208; 11 Jas. 1; 11 Vin. Abr. Execution, (X. a.) pl. 19.
Considering, then, the general spirit and objects of this Statute, I cannot conceive that it was the intention of its framers to deprive creditors of remedies by Execution, which they would have had if the Statute had not been made. And even if these Statutes were considered as containing the whole Law of Executions, I should say that a right to take an Elegit after a Fi. Fa. in part satisfied, and not returned “Nihil” as to the residue, would fall within the spirit, and be sactioncd by the equity of the Statutes.
All the Defendants claiming lands directly under William Bentley, are volunteers, and the Deeds under which they claim, grossly fraudulent, and the Decree as to them correct.
The case is different as to the lands claimed by William A. Bentlev and Coleman, indirectly under him, in respect to which the facts are these: In 1796 or 1797, William Bentlev purchased of Wm. A: Cooke, upwards of eleven hundred acres of land, with an agreement that no Deed was to be made until he had given Bond and security for the purchase money. Wm. A. Bentley was then, and probably long after, an infant.
In August, 1805, Wm. A. Cocke, at the instance of Wm. Bentlev, conveyed this land to Wm. A. Bentley, who paid no valuable consideration for it to any one. Wm. Bentley had not then paid the whole purchase money, or secured it to CocJee, but after-wards paid it to him.
In 1800, James Cocke and Wm. Bentlev exchanged lands, Cocke giving him one hundred and fifty-four acres adjoining the land sold by Wm. A. Cocke to Bentley, at the price of 1,0001., and Bentley giving Cocke about eight hundred acres in Amelia, at $S 7 50 per acre. A considerable part of the difference was paid by James Cocke to JVilliam A. Bentley, by order of his father, William *636 Bentley. In December, 1806, James Coche, at the instance of Wm. Bentley, convéyed the one hundred and fifty-four acres of land to Wm. A. Bentley, who paid no valuable consideration to any one for it.
In May, 1807, Wm. A. Bentley conveyed to his brother Peter E. Bentley, six hundred acres of thesé two tracts of land, by a Deed reciting that their father had purchased the lands from the Messrs. Coches, who had conveyed them to him at the instance, and by the permission of Wm. Bentley, who particularly enjoined it upon him to convey the six hundred acres to Peter E. Bentley, and this is the prily consideration stated, and no other was given by Peter E. Bentley to any one.
In July, 1813, Peter E. Bentley conveyed 'five hundred and twenty acres of this land to Coleman, for the consideration of something more than $6,000, and in October, 1815, Wm Bentley and his wife, with a view to bar her claim to' dower, conveyed the same land to Coleman by a Deed reciting that William Bentley, had purchased the land of Coche, but had not procured any conveyance to himself, or in trust, and liad given it to Peter E. Bentley and Wm. A. Bentley, his sons, to the last of whom Cocke had conveyed the land at his request, who especially enjoined it on William A. Bentley to convey to Peter E. Bentley, all that part of the land which laid above the bridge road. At this time, Coleman had paid only about three-fourths of the purchase money to Peter E. Bentley, but afterwards paid the balance, before, as he says in his Answer, he had any notice of the fraud charged upon the Bentleys, by the Plaintiffs.
At the several periods when all these transactions took place, William Bentley was largely indebted as their Guardian to the female Appellees, who, in August, 1806, chose new Guardians, and in November, 1807, instituted the suit against William Bentley for the settlement of his accounts as their Guardian, in which they obtained the Decrees (in 1S19,) which are the foundation of this suit.
In 1807, and early in 180S, Bentley conveyed the residue of his . estate, real and personal, without any valuable consideration to his other children, and in September, 1811, took the oath of an insolvent debtor. None of the Deeds, under which Coleman claims, from those of the Coches to William A. Bentley, inclusive, were duly recorded. This fact was not charged in the Bill, but being ' urged at the hearing, time was given to enquire into it, and the fact ' afterwards admitted to be so.
If the legal title to these lands had even been in William Bentley, and were claimed under him by direct conveyances from him, *637 made under the circumstances accompanying the transfer of his equitable tittle to William A. Bentley, his Deeds would clearly be void for fraud, so far as W\Ulam A. Bentley was concerned, and even in respect to Coleman, if he had notice of the fraud.
Some doubt seems at one time to have existed upon the question, w^ct-her’ ^ a father or husband purchase lands in the name of his child or wife, or m his own name, causing in either case a conveyance to be made to the wife or child, the transaction could be impeached by a creditor of, or purchaser from, the husband or father, upon the ground of fraud, inasmuch as in such case there is no resulting trust for the husband or father, as in the case of a purchase by one, and a conveyance to a stranger.
In Lady George’s Case, cited Cro. Car. 550, as decided in the 10th of Car. a father having purchased in the name of his daughter, and afterwards soid to another, it was held in the King’s Bench, that unless there tuere some fraud discovered, it was not within the 27th Eliz. though there be many badges of fraud.
in Back v. Andrews, Prec. Ch. 1; 2 Vern. 120, (1689,) a father purchased copyhold, which was conveyed to himself, and his wife and daughter, and their heirs. This was held to be an advancement for the wile and daughter, and not a trust for the husband, and that a mortgage by him should not bind the lands in the lifetime of the wife and daughter.
In Fletcher v. Sedley, 2 Vern. 490, (1704,) Wright, Lord lieeper, inclined, that a lease purchased bj’’ A., and conveyed to B. in trust for A. during his life, and afterwards for C., who lived with A. as his wife, and was so reputed, was not assets of A., nor liable after his death to his creditors; for when a man purchases, he may settle as he pleases, and thought that fraudulent conveyances are made so only by the several Statutes made for that purpose.
In Proctor v. Warren, Sel. Ca. in Lord King’s time, 78, (1729,) Lord King said, that he did not know that it had ever been determined, that if a man indebted, intending to provide for his children, has an estate originally conveyed to them, it should be subject to his debts.
On these cases, which are all that I have met with tending to esfablish the proposition, that such a transaction cannot be impeached for fraud, I remark, that in Lady George’s Case, and that of Back v. Andrews, no fraud appears to have been established, and the declarations of Keeper Wright and Lord King in the other cases, were mere dicta, upon which no Judgment was founded.
The case of Stileman v. Ashdown, as it can be collected from the ' Reports of Alkyns, vol. 2, p. 477, and Ambler, p. 13, appears to *639 have been thus: The father purchased lands, which were conveyed, in 1700, jointly to himself and one of his sons, and their heirs, and other land, which, in 1708, was conveyed jointly to himself and another of his sons. The dates of these purchases are not noticed. They were probably cotenlporaneous with the conveyances. The father was also entitled to an equity of redemption of an estate mortgaged to one of his said sons. In 1721, a creditor of the father obtained a Judgment against him. The father continued in possession of these lands until his death in 1735, when his sons entered upon the estates respectively conveyed to them jointly with their father. The Executor of the creditor filed his Bill against the sons, for satisfaction out of the mortgaged and purchased estates. In 1742, Lord Hardwicke decreed, that the Plaintiff might redeem the mortgage; in which case the mortgaged premises should be sold, and the money paid for tlie redemption of the mortgage, refunded, and then the Judgment, and the posts at Law and in Equity, satisfied. And if the sales of the mortgaged premises should not bo sufficient to satisfy the whole of the Plaintiff’s demands, that then a moiety of each of the estates, conveyed jointly to the father and his sons respectively, should be sold, and the balance düe to the Plaintiffs paid out of the proceeds rateably and proportionably, and the surplus paid to the sons respectively. But, if the sales of the whole property should not be sufficient to pay the whole of the Plaintiff’s demands, the Court reserved the consideration of the rents and profits of the two moieties directed to be sold. Upon a re-hearing in 1743, upon the petition of the Plaintiff, who considered himself aggrieved in that, the Decree did not subject the whole of the purchased lands, and all their rents and profits to his demands, the Decree was affirmed.
In this case the whole of the purchased lands conveyed jointly to the father and sons, was considered, so far as the creditor was concerned, as belonging to the father, but as between the father and the sons respectively, and as between the sons, as belonging to the latter, according to the conveyances. , A moiety was condemned to satisfy the Plaintiff’s demand,, not because the father was entitled by the conveyances to a moiety, for in that case the right of survivor-ship in the sons, which they insisted on, would have been preferable to the lien of the Judgment on the father’s moiety; (6 Co. Rep. 19, Lord Abergaveny’s Case,) but because considering the father as entitled to the whole, so far as the creditor was concerned, yet only a moiety could be subjected in Equity, since no more could have been reached at Law, if it had been a legal estate.
Lord Hardwicke, as reported by Jitkyns, argued that although *640 a purchase by a father, in the name of a child, in general imported; an intention to advance the child, and prevented the implication of a trust for the father, such as would arise in the case of a conveyance to a stranger, yet that a conveyance jointly to the father and child, was not calculated to effect the object of an advancement, and, left it doubtful whether it was so intended; a suggestion which contradicted the express decisions in point in Scroope v. Scroope, 1 Ch. Ca. 27; 15 Car. 2, and Back v. Andrews, before noticed, and the subsequent decision in Dyer v. Dyer, noticed in 1 P. Wins, 112, Note; and I am persuaded that Lord Hardwicke’s Judgment did not proceed on that ground, for if, as between the father and children, respectively, there was a trust for the father, and therefore, and for that reason onlj’-, the property liable for his debts, then for the same reason, the surplus of the sales, after satisfying the debt, would have been Decreed to be paid to the eldest son, as heir at law, and who was a party, whereas the Decree was precisely such as must be made in the case of all fraudulent conveyances, setting them aside so far as to let in the claims of creditors, and leaving them to have full effect as between the parties. And that this was the ground of the Judgment, appears by Lord Hardwicke’s concluding observation: “It is not necessary that aman should be actually indebted at the time he enters into a voluntary settlement, to make it fraudulent, for if he does it with a view to his being indebted at a future time, it is equally so, and ought' to be Set aside.” And Sugden, in his Treatise on the Law of v endors, (page 424,) justly considers this as the ground of the Judgment, “the settlement being considered as voluntary, and fraudulent against creditors.” And after showing that the case of a joint conveyance to father and child cannot be distinguished from that of a conveyance to the child only, but that in both cases, as between the parties, it should be considered as an advancement, he adds, “Fraud is of.course an exception to every rule.”
Thus we have against the dicta of Keeper Wright and Lord Kino, the express decision of Lord Hardwicke, in Stileman v. Ashdown, and the implied admission in Lady George’s Case, that a purchase by a father, and a conveyance to a child, may be impeached for fraud, either by a creditor of, or'purchaser from, the father. And so in Christ’s Hospital v. Budgin et ux. 2 Vern. 683, it was said,- that a purchase in the name of a wife or child after marriage, and voluntary, may, perhaps, be fraudulent as against creditors, in like manner as if the settlement was of property actually vested in the husband or father. And deplorable, indeed, would be the imbecility of the Law if it could hot reach such a case as that *641 a tí d eiv ■ eqñs i d or a t i o n. Here the father purchased in his ow'd riamé> andí'noí in- the names of his childrep; he held- the property, in one' inst'anca,'-'ás his own ten years, and in the'other six, not drily apparently, .hj® as the real beneficial owner of d^i|['Property. He was then largShindebted, and any creditor >vho>?(|pipd then have -had a JudBnpnt against him, might have sulf||cted that property to the payment of his debts, either un'dlpbur Statute, making uses and trusts liable to the chargés and debts of.-the cestui qw trust? or upon the original principles of a Court of Equity, which, following the Law, will, in general, give such relief against equitable estates of the debtor, as might be had at Law, if the estate was legal. The beneficial estate was settled in the father, and it was as much a fraud to give away to a-child this beneficial interest, to the prejudice of his creditors, as to, have conveyed away the legal title in like' manner, if hé had it/ If such a transaction could not be held to fall within the Statute of Frauds, 1 should think it might be well reached by' the general principles of Equity, according to which the Coches were trustees for William Bentley. & And although a conveyance by them to his son, with Wfilfam Bentley’s assent, would-, as between the parties, extinguish the' trust, and the son would hold, the land exempt from it, yet. a Court of Equity might well hold, that by reason of the fraudulent intent of this transfer, the existing trust for Willicpm Bentley should not be thereby destroyed,- but should still subsist so far as creditors were concerned j upon the ground that persons acquiring a title by fraud are held to be trustees for the injured person, although they certainly did nob-intend to acquire the property in that character.
The Decree was, therefore, fight also' as respects the lauds held by Ti lliam Ji. Bentley, and has properly directed the whole, and not a moiety only of the lands held subject to satisfy the demand of the Appellees, to be sold, since there were several Decrees on the same day;- each of which would have taken a moiety of the lands, if they had been extendable at Law.
' As to Coleman, I think he must be considered as' a bona Jidei purchaser, for valuable consideration, without notice of the fraud, and therefore protected against the operation of the Statute of Frauds by its proviso. And as to the lands held by him,- the only question is, -whether they are liable to the claims of Bentley’s creditors on account of the Deeds under which he claims not duly recorded. Upon the fullest consideration,. I am of opinion that they are not. So far as Colemari is Concerned, we are to consider the case as if Wikiam Jl. Bentley had given to- his father an adequate valuable consideration for the transfer of his interest in the *643 lands purchased from the Coches, and that the transaction was tainted by no fraud. The equitable interest of the father was not transferred to the son by the execution of Deeds to him by the Coches, but by the previous authority given by him to them to execute those Deeds. And if such an authority had been given by letter, and the Deeds never made, a bona fide purchaser of the equitable interest from William A. Bentley, would have had a better right now to call upon the Coches for their conveyance of the legal title, than any creditor of William Bentley getting a Judgment against him after the transfer of his equitable right to his son. Such a transfer was valid without Deed, and was not necessarily to be recorded to make it available against bis creditors. The Deeds from the Codecs passed, not Bentley’s equitable title, hut their naked legal title only, and if void so far as to leave that title still in them, yet those Deeds, together with the. other evidence in the cause, would be full proof that William Bentley’s equitable right was transferred to his son, and in respect to Coleman, we must take it to have been dono (as before said) bona fide, and for valuable consideration: So, that if we held the Deeds to be void, it would not avail the Appellees any thing. The Decree as to Coleman should therefore be reversed, and the Bill dismissed, and in all other respects affirmed.
The President, and Judges Cabell, Coalter, and Carr concurred.