CAER, J.
The first question is as to the amount, which Blow can claim of the guardian’s representatives? The administrator of James has recovered against him as surety' in the guardian’s bond; to the amount of this recovery, he claims as surety; and thus far it is agreed, that he has a right to indemnity only. But, as to the claims of the wards, Margaret and Evelina,, there has been no recovery against him: the suit on the guardian’s bond was at the relation of these wards, as well as James; but pending that suit, Blow bought up their claims, and the suit as to them was dismissed. He now contends, that, as purchaser and assignee, he is entitled to stand in their shoes, and recover of Davis’s *estate the full amount of their claims: it is contended, on the other hand, that Blow, being a surety, could not become a purchaser, otherwise than as trustee for his principal, to whom, as well as to himself, the benefit of the purchase must accrue; in other words, that he is entitled to nothing more than the money he had paid, with interest. The chancellor has decided, that there was nothing in Blow’s character of surety, which prevented him from purchasing, for his own exclusive benefit, the rights and interest of the wards: and I am well satisfied that he is correct.
The analogy attempted between the surety in a bond and a trustee or other agent, does not (as it seems to me) hold. Trustees, agents, auctioneers &c. are intrusted confidentially with the property of others, for the pürpose of selling it to the best advantage: it is their duty to use every fair effort, to enhance the sale: but if they are suffered to purchase this property for their own benefit, self-interest prompts them to depress instead of enhancing it; and he must be ignorant indeed of human nature, who has not learned, .that in a conflict between interest anil duty, the latter is too commonly the victim. To prevent these conflicts, and the temptations to fraud, which it is always difficult and often impossible for courts to unravel, the law has wisely determined, that no such agent shall purchase of himself for himself. But how -does this reasoning apply to the surety in a bond? He has bound himself with his principal to pay a sum of money; to the obligee he is a debtor for that sum: but this creates no fiduciary relation between his principal and himself. He has lent the principal his name and his credit: but the principal has trusted nothing to him. In the case before us, Davis was appointed guardian for the three infants, and Blow as his suret3r, became bound with him, that he should discharge his trust faithfully, render just accounts, and pay and deliver to his wards, all such estates as should appear to be due to them, when thereto properly required. The guardian wasted the estate of his wards. At the instance of the surety it was taken from him, and he was ordered to settle *his accounts. This settlement was made on vouchers furnished wholly by himself, and he was found largely a debtor to each of his wards. The guardian died leaving things in this situation : .time passed on ; the infants married ; and suit was brought on the bond against the surety, who, thus bound for the claims of the wards, bought out the interests of two of them. Did he in this, violate the letter or the spirit of that rule, which forbids a trustee to purchase for himself? I cannot conceive how. He bought, not of himself, but of the owners: his purchase was of their rights merely, and did not fix the amount of their claims. Nor was this amount to be fixed in any proceeding against him, or in which he could by collusion influence the decision. So far as he was a purchaser, he had to sue the representatives of his principal, and in that adversary proceeding establish the amount of the debt due from the guardian to his wards. No body will deny, that any stranger could have bought the rights and interests of the wards, and would have stood precisely in their shoes: and shall we deny the same power to the surety, whose kindness had exposed him to the danger of losing such large sums, and who had a much stronger and higher motive than the mere speculator, for seizing upon this tabula in naufragio? What right have the representatives of the guardian to make objections, or to claim the benefit of the purchase? Was it made with their money, or their credit, or at their risk, or by reason of any advantageous position in which they or the guardian had placed the surety, and which imposed on him a fiduciary character? Nothing of all this is pretended. The case, in my mind, stands intirely clear of the analogy attempted to be established.
But it was argued, that there is a privity between the principal and surety; that the latter is let into all the secrets and points of defence of the former, and should not be suffered, with the aid of these, to compromise the claim, and then demand the full amount from his principal. I can see nothing in the privity which should. affect the case, especially in equity; and as to the secrets of defence being imparted to *the surety, and enabling him to compromise, something must be shewn in the record to support these allegations, before we can venture to found conclusions on them. There seem to have been no secrets, no points of defence in the case. The guardian himself had furnished the materials for making up the accounts; and in the only case in which a judgment was rendered on the bond against the surety (that of Dickson administrator of James Davis) it was rendered for the amount appearing on the guardian’s account previously settled. In this particular case, Blow claimed, as surety, to recover only what he had paid, and no objection was made as to the amount of'the judgment. As to the two other cases, the surety purchased the rights merely of the wards: they might be something or nothing; the guardian might be solvent or otherwise; these were risks which he had to run. He bought just as any other would, and had to establish the claims by suit, in which his situation as surety gave him no advantage, and ought to subject him to no disadvantage.
There was another point made at the bar: *249 that Blow cannot recover more than the sum he paid to Bevy, because the deed executed to him by Bevy is not an assignment but a release, and a release to one obligor discharges all his co-ob-ligors. The correctness oí the legal position, that a release to one of several obligors releases all, cannot be doubted; and, if applicable, its effect would seem to be, not merely to restrict the claim of Blow to what he had paid, but to extinguish it altogether. Davis’s representative might say to Blow, “you claim of me under this bond, into which you entered with Davis; but you have got a release from this bond, and that discharges your co-obligor, and me as his representative. ’ ’ So, when a surety pays off a bond, lord Hardwicke says, it would be useless for him to take an assignment of it; and the Master of the Rolls, in a subsequent case, assigns the reason; for he says, if the surety should sue upon it, he must do so in the name of the obligee, and the obligor could plead payment, and defeat the action. But these principles do not apply here: for we know that *80 soon as a surety has satisfied the creditor, he takes his place in equity, with all his rights, and all his powers. And what difference does it make to the principal debtor, whether the surety suffers a judgment first, or discharges the bond without? Suppose A. as principal and B. as surety execute a bond to C. for 1000 dollars. If there is judgment, and B. discharges it (no matter how), A. must pay the amount to him. But if B. takes up the bond, before judgment, what then? he applies to A. “Here is your bond to ,C. in which I was surety; I have taken it up, and you must pay me the money.” A. may say, “you should have applied to me before you discharged the bond; I do not owe the money; the consideration has failed, or there was a fraud; and I will not pay you.” In such a case, B. no doubt, would have to litigate the question, and could only recover of A. what he was found to owe C. But suppose A. should say to the surety, “1 acknowledge that I owe this money; I had a valuable consideration from C. for the bond; and you were so kind as to lend me your credit: but for all this I cannot agree to pay you: you have g'iven only 500 dollars for the bond ; and besides, you have taken no assignment of the claim, but a release merely, which enures to my benefit, as well as yours.” Would not reason and justice and equity reply, “you admit that you owe this money: here is an extinguishment of the claim of your creditor, which your surety has obtained: for what consideration he got it, or whatever the form of the transaction, are questions which do not concern you: you owed the debt to C.; your surety has extinguished his claim, and that transfers his rights and makes you debtor to the surety, for the precise sum you owed him.” Does not this strike the common sense of every man? If not, it must be because he has perplexed his mind with the legal ideas of the equal obligation under which principal and surety come to the creditor, and the operation of a release to one co-obligor: but these ideas have no place in the view which equity takes of the transaction. It considers the debt due by the principal only, ^though both are bound by the bond; and the moment the surety discharges the claim of the obligee, equity makes him the obligee. In the case before us, therefore, it seems to me a matter of no moment, for what consideration Blow obtained the discharge of Evelina’s claim, provided he acted fairly, nor in what form it was taken, provided it effectually shielded the representative of Davis from that claim. Blow states, in his bill, that he purchased the claim, and took an assignment: Mrs. Lawrence says,' she knows nothing of this transaction, and leaves Blow to his proof. The instrument is in the form of a release. Bevy, who executed it, says he sold and assigned his claim, as administrator of his wife, to Blow. These are mere forms of speech, and cannot affect the real character of the transaction before the court. The true questions are, did Davis, as guardian of Evelina, owe her money? and had Blow extinguished that claim in a fair manner? If so, he stands in the shoes of Evelina. These principles appear so clear to me, that I cannot doubt of their correctness. I do not think, therefore, that the form of the deed, whether an assignment or a release, is material: and, though I think it of little moment, whether we take Blow as a surety extinguishing the debt, or a surety purchasing the claim, yet I think we must take him in the latter character; both because the parties to the transaction (and the only parties concerned) say it was a purchase; and because from the nature of the thing it seems so. It was the payment of a sum certain, for an uncertain, unliqui-dated claim, which might be more or less, and which might turn out a total loss from the insolvency of the debtors.
The next question is, as to the validity of the two deeds made by Davis of the 14th October 1807. It is agreed, that the deed conveying the wharf &c. to his two children, in consideration of natural love and affection, is fraudulent and void as to creditors. As tb the other deed, conveying the brick house and the lot it stood on in Portsmouth and the furniture in the house, to the trustee Whitehead; it is contended, on the one hand, that this deed is also fraudulent *and void as to creditors, and on the other, that though this is a post-nuptial settlement, it was fairly made for a valuable consideration, and therefore valid. As these settlements have not often come before the court, I have given the subject some examination, and shall state what seems to me the amount of the cases I have looked into.
That there are circumstances, under which post-nuptial settlements will be supported, both against creditors and purchasers, there can be no doubt. Thus, many cases decide, that a voluntary payment of a portion by any friend of the wife, will be a consideration which will support a settlement made after marriage. Colvile v. Parker, Cro. Jac. 158; Jones v. Marsh, Ca. Temp. Talb. 64; White v. Thornborough, Prec. in Cha. 425; Ward v. Shallot, 2 Ves. sen. 18; Ramsden v. Hylton, Id. *250 304; Russel v. Hammond, 1 Atk. 13; Stileman v. Ashdown, 2 Id. 479. The portion, however, must be paid in consideration of the settlement. Gardner v. Painter, Ca. Temp. King, 65. So the giving up an interest in the settler’s estate, will support a post-nuptial settlement; Jones v. Marsh, ubi supra. And though the relinquishment of this interest be not expressed to be in consideration of the settlement, yet if it be by the same deed, and the settlement is in favour of the person relinquishing, the relinquishment will be presumed to have been the inducement, and not that both were voluntary. And it is the^opinion of Ather-ley, in his able Treatise on Marriage Settlements, (pp. 159-60,) that though the interest was not relinquished by the settlement, but by another deed; yet if it was done about the same time, so that it might be reasonably presumed to be a part of the same transaction, the court would so presume, and look upon it as the consideration which produced the settlement. Por this opinion the cases of Scot v. Bell, 2 Lev. 70, and Chapman v. Emery, Cowp. 278, are cited. In the first of these, the wife joined the husband in levying a fine, and selling a tract of land, which had been settled for the benefit of herself and issue; and on the same day, the husband covenanted *to stand seized of the manor of B. to the same uses, to which the land sold had been settled. The husband, some years after, mortgaged the manor of B. And one claiming under the mortgagee, having brought ejectment, the question was, whether the settlement of the manor of B. was fraudulent quoad the mortgage: and by Hale and the court, 1 ‘the settlement is not void as to the mortgage, for the old settlement being destroyed, and the new made the same day, an agreement by him to make the new settlement, in consideration the wife would pass the fine, and bar the old settlement, shall be intended, and the consideration shall extend to all the uses of the old settlement.” In the case in Cowper, the point was not directly before the court; but lord Mansfield expresses a pretty strong impression the same way. ‘•The cases also shew, that not only the relinquishment by the wife, of a certain and fixed interest in her husband’s estate, but also of a contingent interest, will support a post-nuptial settlement, where there is no badge of fraud; as the giving up her interest in a bond, though contingent. 1 Eq. Ca. Abr. 19; 2 Ves. 16. So, likewise, the releasing her jointure or dower. Pre. in Cha. 113; 2 Lev. 70, 147; 2 Vern. 220. If the parting with these contingent interests by the wife, will support such settlements ; it follows, a fortiori, that her parting with her own estate, or making a charge on it for her husband’s benefit, will support them; 2 Lev. 148, Cowp. 278, and lady Arundell v. Phipps, 10 Ves. 139. It has also been decided, that in settlements after marriage, a consideration moving from the wife, will support limitations to her children, as well as in her own favour; Ward v. Shallet, before cited, Lavender v. Blackstone, 2 Lev. 147. But though these settlements will be supported, where they appear to have been made upon a fair contract for a va’uable consideration, and in the execution of such a contract; yet, from the relative situation of the parties, and the convenient cover they afford a debtor to protect his property and impose upon the world, they are always watched with considerable jealousy. The*weight of authority goes to say, that a post-nuptial settlement will be good against subsequent creditors, even where there is no consideration, provided the settler is not indebted when he makes it, and the transaction is free from circumstances of fraud. But, where the debtor is greatly indebted, and harassed by his creditors, the very fact of his making a settlement, excites strong suspicion; and to support it, an adequate consideration must be shewn, together with the absence of those other badges, which generally attend a fraudulent transaction.
With this view of the law, let us examine the transaction before us. The deed from Davis and wife conveying her land in Charles City, was executed in December 1801. The price and value of this land was 1500 dollars. The deed from Davis to the trustee, for his children and wife, was executed in October 1807, (nearly six years after), and conveys real property valued at 5000 dollars and personalty worth 500 dollars. It was insisted, that these conveyances were made, in execution of an express positive agreement between the husbanfi and the wife, by which she agreed to part with her inheritance, and he, in consideration thereof, bound himself to convey and settle the property mentioned in this deed of trust, to the use of her and her children. We have seen, from some of the cases I have cited, that if the deeds had been made the same day, or about the same time, so as to afford a fair presumption that they were parts of the same transaction, the court might have so presumed; but the lapse of six years takes away all ground for such presumption; and the case must stand (as indeed it was placed in the argument) upon the footing of express and positive contract. It was contended, that this contract was proved, 1. by the answer; 2. by the recital in the deed; 3. bv the parol evidence. As to the answer; every voluntary post-nuptial settlement, where the settler is indebted, is, as against his creditors, fraudulent and void; and every settlement will be taken as voluntary, unless those claiming under it can shew, that it was made for a valuable consideration. *The charge of fraud in the deed, made by the creditor here, is the common charge which every creditor would make under such circumstances; and there is no discovery sought of Mrs. Lawrence, by way of evidence as to the deed. If, under such circumstances, that defendant, charged with fraud in accepting and holding under a voluntary deed, could by her own answer, supply proof of a contract, and the execution of it, by which she establishes a valuable consideration for the deed; then in truth it may be said, that to require proof of a consideration at all is a mere farce, and the statute of frauds (calling for a written contract) a dead letter. But there is no such law: the defendant *251 who, in his answer, sets up a contract by way of defence, must establish it by legal and disinterested evidence. As to the recital in the deed; this point rests upon principles pretty nearly akin to the last. It would put into the hands of a fraudulent debtor, a most dangerous weapon : he could, at pleasure, by his own act, furnish evidence to support every conveyance he might make. In some early cases, it does however appear, that much more weight was given to such recitals than they deserved: see an anonymous case, Pr. in Cha. 101, and Dundas v. Dutens, 1 Ves. jun. 196. But in Battersbee v. Farrington, Swanst. 106, the master of the rolls places the subject in the true light: he says, “The distinction, I apprehend, is, that against all persons claiming under the settler, the recital is conclusive; but it would be difficult to maintain, that a recital in a post-nuptial settlement of ante-nuptial articles of the existence of which there is no distinct proof, would be binding on creditors. Such a doctrine (he adds) would give to every trader a power of excluding his creditors by a recital in a deed to which they are not parties.” Lastly, the parol evidence relied on as proving the agreement, does not prove it. One of the witnesses, whose evidence is relied on, proves nothing at all to the purpose. Another witness proves, not an agreement indeed, but a loose and vague conversation between the husband and wife, in which the husband proposed, that *if the wife would join in the conveyance of her real estate, he would build her a house on a lot of his in Portsmouth, which house and lot he would convey to her. It is impossible to regard this conversation as a contract, without an utter disregard of the policy and letter of the statute of frauds; but take it as the contract, can we consider this deed as made in execution of that contract? They are six years apart. By the contract, he was to convey a house and lot; by the deed, he conveyed a house, two lots, and 500 dollars worth of furniture: by the contract, he was to convey the house and lot to her alone; by the deed, he conveys to the use of himself for life, then to the use of his two children in fee, with power to them, or either, to sell the whole so soon as they arrive at age, and directions to the trustee to convey to their vendee, and it is only in case they shall not choose to alienate, and shall both die without issue living at their death, in the lifetime of the wife, that the trustee is directed to hold the property for her use. Is this executing a contract by which he agreed to convey the property to the sole use and benefit of the wife? It may be said she choose to have it settled on her children; but of such change in the contract (as I call it for argument sake) there is no proof; nor can we presume, that she would wish the land so settled as to cut herself off from all but a bare possibility of ever enjoying it; a possibility predicated upon the death of both her children without issue in her lifetime. In Lavender v. Blackstone, 2 Lev. 147, a man married before he was of age: he received a portion of ;?'2000, with his wife, and promised that when he should arrive at age, he would settle his estates on the marriage. Some three or four years after he came to age, being much indebted, he made a settlement; and this afterwards coming in question, lord C. J. Hale and the court say, in their fourth resolution, “Though it was proved that the infant, upon the marriage, promised to settle his estate when he came to age, upon himself and his issue (which it was agreed, was a sufficient consideration to avoid fraud, though *an infant by law is not compellable to fulfil his promise) yet this settlement, not being made till three or four years after he came of age, and not being made directly according to the said promise, it shall not be presumed to be made in performance of the promise, without direct proof to that purpose.” And the settlement was declared fraudulent. This decision, it must be observed, was made in the 27th year of Charles II. before the statute of frauds, when it was no objection to the promise, that it was by parol. The case of Reade v. Livingston, 3 Johns. Ch. Rep. 481, bears some resemblance to ours. A post-nuptial settlement was made by one in debt, and it was alleged to be in execution of an ante-nuptial parol promise; fourteen years had elapsed between the marriage and the settlement; and the provisions of the settlement did not exactly agree with those of the alleged ante-nuptial parol promise, but they agreed more nearly than in our case. The chancellor, in the course of his opinion, says, “If the present case had arisen prior to the statute of frauds, I apprehend it would have been deemed a fraudulent settlement in regard to existing creditors, from the want of a sufficient con-nexion in point of time, and of correspondence in point of proof, between the settlement and the alleged agreement.”
I should pronounce this settlement, then, fraudulent as to existing creditors, upon these grounds, if there were none other: 1. that there is no contract proved; 2. that if a contract, it is a parol contract for land; 3. that there is such a lapse of time between the alleged contract and the settlement, and such a discrepancy in their terms, that the latter cannot be presumed to be in execution of the former.
But there are other and strong evidences of fraud attending this settlement. The situation of the settler: he had given up business, had become idle and intemperate. The large debts due to his wards, with the full extent of which he was well acquainted, were pressing heavily upon him. A suit was pending against him to compel him to settle the accounts of his guardianship of his deceased ward James *Davis, and distribute his estate; he had been ordered to render his account, and was summoned to attend the commissioners on the 10th October 1807, but excused himself from attending at the appointed day. On the 21st September 1807, his surety Blow, had had him summoned to the ensuing October court, to give him counter security, or deliver up the estate of his wards. And on the 14th October, this settlement was made, just before the court to which he was summoned; for on the 19th October 1807, the court made an order, that Davis should give counter security at the Decem *252 ber term, or deliver up the estate, the summons issued against him having been returned executed. Nor is this all: on the same 14th October, he executed to his two children, a deed for his house and wharf in Portsmouth ; a deed confessedly voluntary and fraudulent. About the same time, too, as it appears in proof, he executed a bill of sale (antedated 10th June 1807), conveying to Miss Maynard, the aunt of his wife, living in his family, ten slaves, and a second bill of sale conveying to her another slave, probably forgotten when the first was made. By these deeds, he divested himself of every atom of property he held in possession ; of house, lands, furniture, slaves; every thing of most necessary and daily use in living. And to whom were these conveyances made? A wife, two children not above seven years of age, and a maiden aunt of his wife, who had always lived, and always continued to live in his family. Could he possibly have selected instruments better fitted for his purpose, if his intention was to cover his property from his creditors, and still retain the use of it? And, accordingly, it is abundantly proved, that he did, to the day of his death, retain the actual use, possession, and substantial ownership of the whole property real and personal. Again ; it is clearly proved, that the transactions were conducted with that sort of secrecy which is always a badge of fraud. There is yet another objection to which this settlement is obnoxious: the consideration for which it is alleged to be made is the wife’s land, worth 1500 dollars; the property settled is worth 5500 *dollars, four times the value; and in these settlements, inadequacy of price, especially if the settler be embarrassed, and the inadequacy gross, is considered among the strongest evidences of fraud. See the very sound remarks of Atherley, in his chapter headed “Considerations which will support settlements after marriage,” and the cases he cites, especially Dewey v. Bayntun, 6 East. 257. These objections taken together force my mind irresistibly to the conclusion, that this settlement was fraudulent in fact and void against creditors.
In the account taken, the commissioner has charged Mrs. Bawrence with the annual value of the house while she occupied it. This charge was sustained by the chancellor, and formed one of the grounds of objection to his decree, in the argument. With respect to this question of rents, and profits, my brethren are against the decree allowing them. I have not been able to bring my mind to the same conclusion, though I cannot say tbat( I have come decidedly to a different one. I, therefore, choose to leave this point open for a fuller court.
As to the case of Blow v. Maynard, in which the chancellor has declared the two bills of sale of slaves, made by John Davis to Eleanor Maynard, bearing date the 10th June and the 19th September 1807, fair and valid as against Davis’s creditors, I differ with him in opinion toto cselo. I have seldom seen a case, which, in my judgment, was more strongly marked with actual fraud. The evidence leaves no doubt on my mind, that the first of those instruments, though it bears date on the 7th June, was probably not executed, and at all events not delivered, till about the 14th October, when Davis was settling all his real estate in possession to the use of his family: that Maynard never paid the considerations expressed in the bills of sale, or any part of them, and never had any means of making such payment: that the payments were feigned, and the transactions wholly fictitious : that notwithstanding the bills of sale Davis continued in possession of all the slaves, taking and enjoying *the profits, thenceforth, till his death: and that these deeds were designed and contrived to defraud Davis’s creditors, and especially his wards, of their just'demands.
GREEN, J.
Agreeing with my brother Carr, that the convej'ances sought to be set aside in these causes, are fraudulent, in law and in fact, and void as to the creditors of the grantor, I shall confine myself to the examination of the questions which arise in consequence of such a declaration.
The first of these is as to the true amount of Blow’s claim. He paid, in order to discharge himself from his responsibility as surety for John Davis, in his bond as guardian of Margaret, Evelina and James Davis, the sum of 3483 dollars 81 cents, upon compromises severally made with those who represented their rights: and if he is only entitled to claim indemnity, as a surety entitled to the remedies which belonged to the creditors, his recovery must be limited to the amount he so paid, and interest thereon. But he insists that he is entitled to claim as assignee of Margaret and her husband, and of the administrator of Evelina, the full amount due from Davis to them, which, together with the amount which he paid to the administrator of James upon a judgment, would be equal to nearly three times the amount of what he was really out of pocket.
The bill alleges, that, in consideration of 1000 dollars &c. the administrator of Evelina assigned to Blow his claim against Davis; and the deed of the administrator, is exhibited in support of that charge. The administrator, in his answer, admits that, by a deed executed by him, a copy of which was exhibited as a part of his answer, he did, for the consideration therein mentioned, assign'and transfer to Blow all his interest in the debt due by John Davis to his intestate as her guardian, and released him from all claims on account of Davis’s guardianship. Erom these pleadings, no one could possibly conceive, that Blow intended to affirm, or the administrator to admit, that there was any contract between the parties, other than that evidenced by the deed *exhibited by both (for they are precise copies of each other) as the evidence in support of the declaration and admission, that an assignment had been made: there is no suggestion, that there was any agreement other than that evidenced by the deed, or that there was any mistake or omission in reducing the agreement to writing. When we look at that deed (which is perfectly formal) it contains a simple release of Blow’s liability for Davis’s guardianship, *253 and not the slightest intimation of an intent or agreement to assign the claim against him. The fact of the assignment averred in the bill, is put in issue by the answer: it was one in which the defendants had a deep interest, and in respect to which they had a right to call for proof: and no proof is given. The answer of the administrator would be no evidence against the other defendants, even if it admitted an assignment otherwise than by the deed itself.
The deed executed by the parties, in pursuance of the compromise between Blow and the other ward, Margaret, does indeed contain a formal assignment to him, of all her claims upon Davis’s guardian’s bond: but, at the same time, it contains also a general release of Blow’s responsibility as his surety. This release extinguished the obligation in toto, as to all the parties. A release of one of several obligors, whether the obligation be joint only, or joint and several, is a release of all, even if it contain a proviso that the others shall not have the benefit of it. Everard v. Herne, Litt. Rep. 191; Clayton v. Kynaston, 2 Salk. 574. It was argued, that the surety might take an assignment of the debt and obligation of his principal, with the same effect as any stranger. Admit it (though the position is not maintainable) and what would be the effect of a release of one obligor, and an assignment quoad the other, to a stranger, by the same instrument? The assignment would pass nothing, since the release would annihilate the obligation intirely. But suppose there had been no release connected with the assignment, the effect would have been the same; it would have been a payment or satisfaction of the debt, which the principal *might have pleaded with effect, since no man can owe a debt to himself. And this was in effect the judgment of lord Hardwicke in Gammon v. Stone, 1 Ves. sen. 339, in which he held, that a surety upon paying the debt, could not claim an assignment, because “it would be quite useless.” Neither is there any instance in which a surety has come into a court of equity, claiming as a legal or equitable assignee, the benefit of the securities given by his principal to the creditor: he can only claim to be substituted to the right of the creditor, in respect to such securities, so far as to indemnify him. And this, I think, is the measure of the relief, to which Blow, the surety here, is entitled.
In respect to the personal property fraudulently conveyed, those who have held and enjoyed it, are accountable to the creditors of the fraudulent donor, for it and its proceeds and profits, in like manner as a rightful executor would be. The grounds upon which such creditors may resort to a court of equity, were examined in Chamberlayne v. Temple, 2 Rand. 384. In the present case, there was an additional ground of jurisdiction; the necessity of resorting to that tribunal, to prevent the property from being withdrawn from the claims of the creditor: an ordinary branch of equitable jurisdiction, in cases of fraud combined with danger to the property, or of misconduct, waste or improper disposition of the assets, even in the case of a rightful executor. Anon. 12 Ves. 4; Middleton v. Dodswell, 13 Id. 266.
The chancellor properly held, that Mrs. Lawrence was not entitled to dower in the lands descended to Davis’s children, which were held by his mother in dower until after his death, and that she was entitled to dower in the real property conveyed by Davis to his children and the trustee Whitehead, not indeed fcr the reason assigned, that the fraud, with which these conveyances were tainted, cannot be imputed to her by reason of her coverture, but because she did not join in the conveyances.
Another question is, whether the lands descended to Davis’s heirs (the dower lands of his mother) and those conveyed *by him to his children and Whitehead (which, for the purposes of this cause, must be also considered as descending to the heirs of Davis, the conveyances being void), ought to be sold out and out, or only extended for the satisfaction of the plaintiff’s claim. I do not know, that this question has ever been considered in this court. In the late cases of Coleman v. Cocke, 6 Rand. 618, and Haleys v. Williams, 1 Leigh, 140, it did not occur. In the former, no objection was made to the decree directing the sale of the lands, as it was said to be wholly immaterial to the interests of the parties whether they were sold or not; and, in the latter, there was a valid mortgage which the judgment creditors had a right to redeem, and to stand in the shoes of the mortgagees, and (selling the land under the mortgage) to tack their judgments.
The real question here is, not whether a court of equity setting aside a fraudulent deed in favour of a judgment creditor in the lifetime of the debtor, can sell the land (a power repudiated by lord Hardwicke in Higgins v. The York Buildings Co., 2 Atk. 107,) but, whether, in such a case, in a proceeding in equity against the heir and fraudulent donee of the debtor, upon a judgment against him in his lifetime, or on his bond binding his heirs, the lands can be sold? In the case of a creditor, who had obtained a judgment in the lifetime of the debtor, lord Hardwicke decided that question in the affirmative, decreeing a sale of a moiety only of the land, because only a moiety was bound by a judgment at law: declaring, that equity, whilst it could not change the rights of the parties, might accelerate the payment, by directing the sale of a moiety, and not let the creditor wait until he was paid out of the rents and profits. This principle was asserted by lord Redesdale in O’Gorman v. Comyn, 2 Scho. & Lef. 138, and O’Fallon v. Dillon, Id. 13. He states, that such was the settled doctrine in Ireland, where, we know, the english law is established, both in the courts of law and equity. The rule seems to have been established in England, as far back at least as 1730; when, *in the case of Robinson v. Tong, 3 Vin. Abr. Assets, A. pl. 28, p. 145, it was affirmed by counsel; and, in that case, an advowson was decreed to be sold at the instance of creditors, as assets descended, and the decree- *254 was affirmed in the house of lords. The creditors, there, do not appear to have been, and probably were not, judgment creditors. This principle, so far as I am informed, has been uniformly practised on in Virginia, in the cases of heirs bound by the obligations of their ancestors. And although I cannot see clearly the foundation of this equity to sell, when the law only authorizes an extent, or a personal judgment or decree against the heir, for the value of the assets descended, whether alienated by him or not (see the statute of fraudulent devises), yet, I think we are bound by the practice founded on these precedents so long acquiesced in.
The only portion of the real property in question, which has produced any profits since the death of Davis, is the house in which he resided, and the lots connected with it. These have been occupied by Mrs. Davis, during her widowhood, both before her second marriage, and after the death of her second husband, and by him during his life. Estimated rents (abating one third for her dower) with interest during the whole time, have been decreed against Mrs. Lawrence, The propriety of that part of the decree is questioned.
The decree is certainly erroneous, so far as it subjects her to the payment of rents and profits accruing during her second cov-erture, and with interest on any portion of them.
There is no adjudged case, either here, or in the courts of Westminster hall, so far as I am informed (and the counsel in this cause admitted it to be so) which determines the question, whether or no, in a case where there is no incumbrance on the land descended, either by judgment against the ancestor or otherwise, and a creditor by bond binding the heir, sues him at laiv or in equity, the rents and profits received by him can be reached as assets. There are, however, various ‘ dicta to be found in respect to that question. *The first is in the year book of 48 Ed. 3, 32, b., which as abridged by Viner (vol. 3, Assets, C. pl. 3, p. 147,) is to this effect: “If the heir aliens the assets by fraud to oust the debtee of his action, and takes the profits to the value of the debt, this shall be assets.” But Brooke, in abridging the same case (tit. Assets by descent, pl. 10, quoted 3 Vin. Assets, B. pl. 3, p. 146, note) states it more at lai'ge, thus: “So when the plaintifE said that assets descended to the heir, and that he had conveyed them' away by fraud to oust him of his action, of which lands the heir took the profits; and the defendant said, that he made a feoffment to J. R. in fee upon condition, and as to taking the profits no law will put him to answer; and it was not adjudged: nevertheless it seems, that it is not assets to charge him, for he had no franktenement in him of it.” And in Heningham’s case, Dyer 344, pl. 1, Dyer said, extrajudicially, “If the profits of the land descended, from the death of the ancestor to the day of the writ, amount sufficiently to satisfy the debt, and the plaintiff will shew that to the court, in an action of debt against the heir, and he cannot deny it, the plaintiff shall have a general judgment and execution immediately;” that is a personal judgment against the heir; which Manwood denied totis viribus. In Shetelworth v. Neville, 1 T. R. 454, in an action of debt against an heir upon the bond of his ancestor, he pleaded, that particular lands specified descended to him, that his ancestor was bound to him in a bond for a specified sum, and that he had laid out for repairs of the property ^100. beyond the rents and profits received before the suing out of the writ; to which the plaintiff demurred; and the court sustained the demurrer, upon the ground, that the plea was bad for want of an averment, that the repairs were necessary, and made before he had notice of the plaintiff’s demand. And Ashurst, J., added as “a more substantial objection to the plea, in point of reason, that the case of an heir at law is not like that of a trustee for the payment of debts. A trustee is not at liberty to apply the rents and profits to his own use: they *must go in diminution of the just debts; but that is not the case with respect to an heir at law; for till possession is recovered against him, he is entitled to the rents and profits; he is entitled to" receive them till judgment is given against 'him. In the meantime, he may have received more than sufficient to pay for the repairs.” In the case of Higgins v. The York Buildings Co., 2 Atk. 107, several judgment creditors filed a bill to set aside a deed for an estate, as being fraudulent as to them; which being done, they claimed against the fraudulent donees an account of the rents and profits from the filing of the bill; which was refused. The observations of lord Hardwicke are stated in a most confused and blundering way, after the manner of that reporter; who attributes to him the declaration, that “he did not'know, in the case of fraudulent conveyances, that the court of chancery had ever done any thing more than remove the fraudulent-conveyances out of the way; nor were there any cases which he could find, of decreeing profits back against the original debtor and owner of the estate, received pendente lite, in that court, in fa-vour of judgment creditors from the filing of the bill, nor any instance of a decree for a sale; but equity follows the law and leaves them to their remedy by elegit, without interfering one way or the other.” It does not appear, whether the fraudulent donor was dead or alive; but I presume he was alive, as is indicated from the tenor of the foregoing remarks, and the fact, that shortly after, in the case of Stileman v. Ashdown, he decreed the sale of a moiety of the debtor’s land in a suit by a judgment creditor against the heir. Lord Hardwicke is also reported to have said, that the plaintiff (speaking of one only where there were several) but for the fraudulent conveyance, might have had an elegit at law, but that could have entitled him only to a moiety: but there being more judgment creditors than one, gave a handle to decree an account of profits from the time of the decree. No reason is assigned for this conclusion ; nor can I imagine any, which would not apply to one as well as to several judgment creditors, *under *255 the same circumstances; especially, if the chancellor followed up the principles laid down hy himself in the same case, and, removing the impediment, left the plaintiffs to their remedy by elegit; in which case, no account of profits from the time of the decree, could be of any benefit to them, as immediately after the decree they might execute their elegits. This reporter attributes a further remark to the chancellor: “the most usual case in this court, is a judgment creditor coming here against an heir at law, for an account of the rents and profits received by him, being considered as assets of the ancestor; for, if he brought an action of debt, he would have judgment for the full value of the estate, and therefore courts of equity make their decrees conformable to the judgment at law.” This indicates that lord Hard-wicke was of opinion, that in some cases a judgment creditor was entitled to an account of rents and profits from the heir, but it is not clear, whether he meant a creditor by judgment against the ancestor, or one who had obtained a judgment against the heir, or both. From the terms of the decree in the case of Stileman v. Ashdown (shortly after determined) as reported by Ambler, which reserved the question as to rents and profits, it would seem, that he had in his mind the case of creditors by judgments against the ancestor, which were a lien on the estate. But this is contradicted by the subsequent remark, that “ if he had brought an action of debt against the heir” &c. Such an action could not be maintained upon a judgment against the ancestor; the only mode, in which it could be enforced against the lands descended, being by a scire facias against the heir as terretenant, and that only for a moiety and not the whole estate or its value. And yet he could not have referred to a creditor by judgment against the heir, for he supposes no action of debt to have been brought against him. All we can make of this confused re|Jort (the fault of the reporter, and not of the eminent judge who decided the case) is, that in whatever cases lord Hard-wicke considered the heir responsible for rents and profits, he grounded *his opinion upon the capacity of the creditor to recover the full value of the estate, by force of the statute against fraudulent devises; which is the same, to this purpose, with us as in England, That statute allowed the creditor to recover that full value, either when the heir had alienated the estate before the suing out of the writ, or without such alienation, if the heir pleaded “nothing by descent.” The plaintiff might reply that he had assets by descent, and if the jury found that he had, the plaintiff might, at his election, have a special judgment against the land descended, or a general and personal judgment against the heir. This statute applies, in terms, to bills in equity, as well as suits at law, and gives no remedy for profits received by the heir. Bord Hardwicke’s declaration, that decrees in equity were conformable to the judgments at law, whether generally or under the statute, excludes the idea, that any such decree can be given for profits, since no such judgment at law was ever given.
We can make nothing of these dicta; and without the aid of authority and precedent, this question must be decided upon principle.
A creditor of the ancestor, by bond binding his heirs, had no lien upon the land descended, as is proved by the consideration, that if the heir had aliened the land bona fide before suit brought, he was in-tirely discharged from all responsibility for the debt at common law; although in equity, even before the statute against fraudulent devises, he was held to be responsible to the creditor for the value of the land aliened. Coleman v. Winch, 1 P. Wms. 777. The statute imposed the same responsibility upon him, in that case, in a suit at law; and gave to creditors a priority according to the date of their judgments, as in' suits by creditors in equal degree, against executors and administrators; and also subjected the heir to a personal judgment for the value of the land descended, whenever he falsely pleaded nothing by descent. This was a relaxation of the common law, by which in such case the heir was liable to *a personal judgment for the whole amount of the debt. This statute substituted the value of the land for the extent at common law. That did not reach the profits already received by the heir; nor does the statute subject such profits to the claim of the creditor in any case. A court of equity, instead of a personal decree against the heir, for the value of the land remaining in his hands, gives, in effect, relief to the same extent, by giving the proceeds of the sale of such lands; thus conforming to the spirit of the statute, and only changing the form, not the substance of the relief. But, if it gave also the rents and profits received by the heir, this would be changing the rights of the parties. If Blow could have maintained an action at law upon the guardian’s bond against Davis’s heirs, and they had pleaded, as they have in this case, that they had nothing by descent, and an issue had been taken on the plea; the very question of fraud involved in this suit, would have been involved in that issue; and if found for the plaintiff, all he could have had would have been an extent of all the land, or a personal judgment against the heirs for its value, at his election, and could not have reached the previous rents and profits. Why then should he be entitled to an account of these rents and profits in equity? I can, indeed, see a very persuasive reason for holding, in a case of a judgment against the ancestor (which binds his lands from its date, and under which a moiety might be taken immediately, and delivered to the creditor at a reasonable extent, so as to give him the subsequently accruing rents and profits, and he is deprived of that benefit by a fraudulent conveyance), the fraudulent donee, whether in the lifetime or after the death of the debtor, whether a stranger or his heir, should compensate in equity for the injury done by his fraud, and the amount of that compensation should be determined by the *256 amount of the rents and profits, enjoyed bjr him, and lost to the creditor, by reason of the fraud. But, in the case of a suit against the heir upon the ancestor’s bond, no right accrues to the plaintiff to have the rents and profits until judgment *or decree; and, therefore, a fraudulent conveyance, either to the heir or a stranger, deprives the creditor of no part of the rents and «profits, which he would have been entitled to and received, but for the impediment of the fraudulent conveyance. For, whether such a conveyance existed or not, the creditor must have prosecuted a suit to judgment or decree, before his title to the rents and profits could accrue.
I am, therefore, of opinion, that in such case, the creditor is not entitled to an account of past rents and profits, whether received by the heir or a- stranger.